01

02

03

04

05

06

07 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

08

09 ADAM MICHAEL MOORE,                )
                                     )   CASE NO.   C10-512-RSM
10        Plaintiff,                 )
                                     )
11        v.                         )   REPORT AND RECOMMENDATION
                                     )
12 SEAN DUMAS, *et al.*,             )
                                     )
13        Defendants.                )
   _____    )

14

15              INTRODUCTION AND SUMMARY CONCLUSION

16        Plaintiff is a Washington prisoner who is currently incarcerated at the Washington State

17 Penitentiary.   He brings this action under 42 U.S.C. § 1983 to allege violations of his

18 constitutional rights during two periods of confinement in the King County Department of

19 Adult and Juvenile Detention ("KCDAJD") between April 2007 and July 2010.   Specifically,

20 plaintiff alleges that he was physically and verbally abused by corrections officers, that he was

21 denied medications necessary for treatment of his mental health issues, and that he was

22 confined in isolation units for long periods of time.   Plaintiff identifies the following seven

REPORT AND RECOMMENDATION
PAGE -1

01  employees of the KCDAJD as defendants in this action:   Sean Dumas; Vicki Shumaker;

02  Nancy Light; David Vestal; Jesse Rollolazo; Bernie Dennehy; and, Ward Weaver.   Plaintiff

03  seeks injunctive relief and damages.

04       Defendants now move for summary judgment.   Plaintiff has filed a response to

05  defendants' motion and defendants have filed a reply brief which contains within it a motion to

06  strike plaintiff's response on the grounds that the response was not timely filed.   The Court,

07  having reviewed defendants' motions, and the balance of the record, denies defendants' motion

08  to strike plaintiff's response and recommends that defendants' motion for summary judgment

09  be granted.

10                                    <u>BACKGROUND</u>

11       The claims asserted by plaintiff in his amended civil rights complaint arise out of two

12  separate periods of incarceration in the KCDAJD.   Plaintiff's first period of incarceration

13  began on April 19, 2007, when he was booked into the King County Regional Justice Center

14  ("RJC") in Kent on multiple outstanding warrants for probation violations.   (*See* Dkt. No. 28 at

15  2 and Dkt. No. 30 at 2.)   Plaintiff was subsequently transferred to the King County

16  Correctional Facility ("KCCF") in Seattle where he remained until his release on May 30,

17  2009.[1]   (*See id*.)   During this period of incarceration, plaintiff had 15 infractions for violating

18  institution rules.   (*See* Dkt. No. 28 at 2 and Dkt. No. 30 at 2.)   Plaintiff was classified as ultra

19  _____

20       1 Defendants assert in their motion papers that plaintiff was transferred from the RJC to
     KCCF on April 21, 2007.   (*See* Dkt. No. 28 at 2 and Dkt. No. 30 at 2.)   However, documents
21   submitted in support of defendants' summary judgment motion make clear that plaintiff was
     still confined at the RJC for much of May 2007, and that he was not transferred to KCCF until
     approximately May 24, 2007.   (*See* Dkt. No. 29, Ex. 1 and Dkt. No. 31, Ex. 1.)   Defendants'
22   documents are consistent with plaintiff's assertion in his amended complaint that the first of
     two alleged incidents of excessive force occurred at the RJC in May 2007.   (Dkt. No. 10 at 5.)

REPORT AND RECOMMENDATION
PAGE -2

01 security and was housed in administrative segregation during the majority of his incarceration

02 as a result of his violent behavior, problems with other inmates, and abusive comments and

03 actions towards staff.   (*See id*.)

04       During this first period of incarceration, plaintiff was involved in two incidents which

05 give rise to the excessive force claims asserted in the amended complaint.   The first incident

06 occurred at the RJC in May 2007 and involved defendant Vestal.   (*See* Dkt. No. 10 at 5-7.)

07 The second incident occurred at KCCF in February 2008 and involved defendant Weaver.   (*Id*.

08 at 8-10.)   These two incidents will be discussed in greater detail below.

09       Plaintiff's second period of incarceration began on July 11, 2009, when he was again

10 booked into KCCF.   (*See* Dkt. No. 30 at 2.)   Plaintiff remained at KCCF until July 16, 2010

11 when he was transferred into the custody of the Washington Department of Corrections.   (*See*

12 *id*.)   When plaintiff was booked into KCCF in July 2009, he was classified as ultra security and

13 was housed in administrative segregation.   (*Id*.)   Plaintiff remained in administrative

14 segregation for a majority of this second period of incarceration as well.   (*Id*.)

15       During this second period of incarceration at KCCF, plaintiff complained to jail staff

16 about not being given proper medications to treat his mental health issues and about being

17 housed in administrative segregation and protective custody.   (*See* Dkt. No. 10 at 4.)   The

18 failure of staff to resolve those complaints in plaintiff's favor gives rise to the claims asserted

19 against defendants Dumas, Shumaker, Dennehy, Rollolazo, and Light.   (*See id*.)

20       Plaintiff initially filed this civil rights action in March 2010 while he was still confined

21 at KCCF.   (*See* Dkt. No. 1.)   Because of deficiencies in plaintiff's original complaint, the

22 Court declined to serve the complaint, but granted plaintiff an opportunity to amend.   (Dkt. No.

REPORT AND RECOMMENDATION
PAGE -3

01   7.)   Plaintiff filed his amended complaint on June 3, 2010, and that complaint was

02   subsequently served on defendants.   (Dkt. Nos. 10 and 14.)   Defendants thereafter filed a

03   timely answer to the amended complaint and the Court established a pretrial scheduled which

04   included a discovery deadline of December 17, 2010, and a dispositive motion filing deadline

05   of January 18, 2011.   (Dkt. Nos. 25 and 26.)

06          Defendants filed the pending motion for summary judgment on January 14, 2011, and

07   that motion was noted on the Court's calendar for consideration on February 11, 2011.   (*See*

08   Dkt. No. 28.)   On February 14, 2011, the Court received a document from plaintiff entitled

09   "Motion to Dismiss Summary Judgment under Rule 56(f)," which the Court construes as

10   plaintiff's response to defendants' summary judgment motion.   (*See* Dkt. No. 33.)   On March

11   4, 2011, defendants filed a reply brief in support of their motion for summary judgment and

12   included therein a motion to strike plaintiff's untimely response.   (*See* Dkt. No. 34.)   The

13   Court deems the briefing in this matter complete and will proceed to consideration of the

14   pending motions.

15                                    DISCUSSION

16                          Defendants' Motion to Strike

17          The first matter that must be taken up by the Court is defendants' motion to strike

18   plaintiff's response to their pending motion for summary judgment.   Defendants argue that the

19   response should be stricken because it was not timely filed.   (*See* Dkt. No. 34.)   The record

20   reflects that the response was, in fact, untimely as it was not mailed to the Court until the day

21   before the noting date and it was not received by the Court until after the noting date had passed.

22   (*See* Dkt. No. 33.)   The record also reflects that plaintiff failed to provide proof that he served

REPORT AND RECOMMENDATION
PAGE -4

01  his motion on counsel for defendants as required by Local Rule CR 7(b)(1).   While this Court

02  does not condone plaintiff's failure to comply with the court's well established rules governing

03  motion practice, the Court deems it important to address the request set forth in plaintiff's

04  response that defendants' summary judgment motion be denied under Fed. R. Civ. P. 56(f).

05  The Court therefore accepts the response for filing.[2]

06         Rule 56(f) permits the Court to deny or continue a motion for summary judgment where

07  "a party opposing the motion shows by affidavit that, for specified reasons, it cannot present

08  facts essential to justify its opposition."   While plaintiff contends in his response that he cannot

09  get declarations from witnesses, he also concedes that "it will be very hard if not impossible" to

10  do so.   (Dkt. No. 33 at 6.)   Plaintiff does not explain what efforts, if any, he has made to secure

11  witness statements thus far.   Moreover, nothing in the record suggests that plaintiff made any

12  effort to conduct discovery in this matter during the discovery period.   For these reasons, this

13  Court deems it appropriate to proceed to consideration of defendants' summary judgment

14  motion.

15                              <u>Summary Judgment Standard</u>

16         Summary judgment is proper only where "the pleadings, depositions, answers to

17  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

18  genuine issue as to any material fact and that the moving party is entitled to judgment as a

19  matter of law." Fed.R.Civ.P. 56(c).   The moving party has the burden of demonstrating the

20  absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S.

21  _____

22         2 The Court also notes that defendants have not been prejudiced by plaintiff's untimely
response.   The response contains no legal arguments or evidence and, in any event, defendants
became aware of the response in sufficient time to file a reply brief.

REPORT AND RECOMMENDATION
PAGE -5

01    242, 257 (1986).   Genuine disputes are those for which the evidence is such that a "reasonable

02    jury could return a verdict for the nonmoving party."   *Id*.   Material facts are those which might

03    affect the outcome of the suit under governing law.   *Id*.

04        In response to a properly supported summary judgment motion, the nonmoving party

05    may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts

06    demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the

07    existence of the elements essential to his case.   *See* Fed. R. Civ. P. 56(e).   A mere scintilla of

08    evidence is insufficient to create a factual dispute.   *See Anderson*, 477 U.S. at 252.   In ruling

09    on a motion for summary judgment, the court is required to draw all inferences in a light most

10    favorable to the non-moving party.   *Id*. at 248.

11                                          <u>Section 1983 Standard</u>

12        In order to sustain a cause of action under 42 U.S.C. §1983, a plaintiff must show (i) that

13    he suffered a violation of rights protected by the Constitution or created by federal statute, and

14    (ii) that the violation was proximately caused by a person acting under color of state law.   *See*

15    *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).   The causation requirement of § 1983

16    is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

17    another's affirmative act, or omitted to perform an act which he was legally required to do that

18    caused the deprivation complained of.   *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981)

19    (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

20                                          <u>Excessive Force</u>

21        Plaintiff alleges in his amended complaint that he was physically and verbally abused

22    by corrections officers during his first period of incarceration.   Plaintiff identifies two specific

REPORT AND RECOMMENDATION
PAGE -6

01  incidents of alleges abuse in his amended complaint, one involving Corrections officer David

02  Vestal in May 2007 and one involving Corrections officer Ward Weaver in February 2008.

03        The United States Supreme Court has made clear that "the Due Process Clause protects

04  a pretrial detainee from the use of excessive force that amounts to punishment."   *Graham v.*

05  *Connor*, 490 U.S. 386, 395 n. 10 (1989).   The Ninth Circuit has determined that "the Fourth

06  Amendment sets the 'applicable constitutional limitations' for considering claims of excessive

07  force during pretrial detention."   *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir.

08  2002) (citing *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996)).   Thus,

09  plaintiff's claim of excessive force must be evaluated under the Fourth Amendment's objective

10  reasonableness standard.   *Pierce*, 76 F.3d at 1043.

11        In *Graham*, the Supreme Court explained that determining whether a particular use of

12  force was "reasonable" under the Fourth Amendment "requires a careful balancing of the

13  nature and quality of the intrusion on the individual's Fourth Amendment interests against the

14  countervailing governmental interests at stake."   *Graham*, 490 U.S. at 396 (internal quotations

15  omitted).   Among the factors that must be considered in evaluating a claim of excessive force

16  are "whether the suspect poses an immediate threat to the safety of the officers or others," and

17  "whether he is actively resisting."   *Graham*, 490 at 396.   *See also Arpin v. Santa Clara Valley*

18  *Transp. Agency*, 261 F.3d 912 (9th Cir. 2001).   The Supreme Court made clear in *Graham* that

19  "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a

20  reasonable officer on the scene rather than with the 20/20 vision of hindsight."   *Graham*, 490

21  U.S. at 396.

22  / / /

REPORT AND RECOMMENDATION
PAGE -7

01       ***1.     Corrections Officer David Vestal***

02       Plaintiff asserts in his amended complaint that defendant Vestal, together with other

03 unnamed officers, abused their power, and physically injured plaintiff, when they dragged him

04 across the floor backwards while escorting him from one RJC unit to another in May 2007.

05 (Dkt. No. 10 at 5-6.)   As plaintiff describes the incident, defendant Vestal, at some point during

06 the escort, directed plaintiff to get on his knees, with his back to officers, and to put his hands

07 behind his back to be handcuffed.   (*Id*. at 5.)   According to plaintiff, once defendant Vestal

08 applied handcuffs, he and another officer began dragging plaintiff across the floor, pulling on

09 his arms while his legs were still bent at the knees.   (*Id*.)

10       Plaintiff contends that being dragged in this fashion caused extreme pain to his wrists

11 and lower back, and that after being dragged like this for over a hundred feet, he "instinctively"

12 bit defendant Vestal to make him stop.   (*Id*.)   Plaintiff further contends that defendant Vestal

13 and the other officer then put him on the ground where he was pepper sprayed and his neck was

14 "crushed" by an unknown officer's knee.   (*Id*.)   Plaintiff acknowledges that he was charged

15 with custodial assault as a result of this incident, but maintains that he was essentially acting in

16 self-defense and that the incident could have been avoided if defendant Vestal had followed

17 standard transfer procedures instead of dragging plaintiff across the floor.   (*Id*. at 6.)

18       Defendants argue in their summary judgment motion that defendant Vestal did not use

19 excessive force against plaintiff at any time during plaintiff's incarceration.   The Certification

20 for Determination of Probable Cause filed in King County Superior Court in support of the

21 custodial assault charge, and submitted by defendants in support of their summary judgment

22 motion, offers a more comprehensive view of the incident in question.   (Dkt. No. 29, Ex. 1.)

REPORT AND RECOMMENDATION
PAGE -8

01      The certification states that on the evening of May 24, 2007, plaintiff, who was then

02 confined in R-Unit at the RJC, was causing a disturbance in his cell by throwing his chair

03 against the wall and the window.  (Dkt. No. 29, Ex. 1.)  Plaintiff's behavior was reported to

04 Sergeant Katherine Jones who ordered all available officers to meet her in R-Unit.  (*Id*.)  Six

05 officers, including defendant Vestal, responded.  (*Id*.)  When officers reached plaintiff's cell,

06 Sergeant Jones ordered plaintiff to back up to the door and sit on his knees so that he could be

07 handcuffed.  (*Id*.)  Plaintiff called Sergeant Jones a "fat bitch" and refused to comply with her

08 order.  (*Id*.)  Sergeant Jones then repeated her order and plaintiff asked what would happen if

09 he didn't comply.  (*Id*.)  Sergeant Jones advised plaintiff that she would assemble an

10 extraction team and forcibly remove him from the cell.  (*Id*.)  Plaintiff eventually complied

11 with the order and was handcuffed.  (*Id*.)

12      As officers walked plaintiff toward the door of R-Unit, plaintiff began resisting and he

13 called defendant Vestal a "nigger."  (*Id*.)  Sergeant Jones then ordered officers to turn plaintiff

14 around and escort him so that he was walking backwards.  (*Id*.)  The certification notes that,

15 for safety reasons, this is a standard procedure employed with non-compliant offenders.  (*Id*.)

16 Plaintiff refused to walk and one of the officers therefore had to carry plaintiff's legs.  (*Id*.)

17 When the group reached the R-Unit sally port, plaintiff began thrashing, spitting and kicking at

18 officers.  (*Id*.)  Defendant Vestal yelled that plaintiff was biting him at which point three of

19 the officers, including defendant Vestal, used counter-joint and straight-arm bar techniques to

20 take plaintiff to the ground.  (*Id*.)  Once on the ground, plaintiff continued to resist and

21 Sergeant Jones administered pepper spray.  (*Id*.)  Officers eventually got plaintiff standing

22 again, but then had to carry him to the administrative segregation unit.  (*Id*.)

REPORT AND RECOMMENDATION
PAGE -9

01     Following the incident, defendant Vestal was treated at the Valley Medical Center for a

02 bite wound to his right forearm.  (Dkt. No. 29, Ex. 1.)  Approximately two months later,

03 plaintiff entered a guilty plea to the charge of custodial assault for his assault on defendant

04 Vestal.  (*Id*., Ex. 2.)  Plaintiff was subsequently sentenced to a term of four months

05 confinement for that offense.  (*Id*., Ex. 3.)

06     Plaintiff, in his response to defendants' motion, asserts that defendant Vestal's

07 representation that he resisted and therefore had to be escorted backwards constitutes perjury as

08 plaintiff claims he never resisted before being dragged across the floor.  (Dkt. No. 33 at 2.)

09 Plaintiff also reiterates his claim that he bit defendant Vestal in self-defense.  (*Id*. at 3.)

10 However, plaintiff offers no evidence to support his version of events.

11     The evidence in the record demonstrates that defendant Vestal was one of several

12 officers involved in escorting plaintiff on May 24, and that the escorting officers exerted some

13 force in response to plaintiff's apparent efforts to resist.  (*See* Dkt. No. 29, Ex. 1.)  There is no

14 evidence in the record to support plaintiff's claim that he was dragged across the floor nor is

15 there any evidence that plaintiff suffered any injury as a result of officers' attempts to gain his

16 compliance.  Moreover, there is no evidence to suggest that defendant Vestal himself

17 employed any force which could be considered excessive in the circumstances presented here.

18 Defendants are therefore entitled to summary judgment with respect to the excessive force

19 claim asserted against defendant Vestal.

20     **2.    *Corrections Officer Ward Weaver***

21     Plaintiff also asserts in his amended complaint that on February 12, 2008, defendant

22 Weaver slammed him to the floor while he was in handcuffs, verbally threatened him, and

REPORT AND RECOMMENDATION
PAGE -10

01   sexually harassed him.   The incident in question occurred while KCCF officers, including

02   defendant Weaver, were transporting plaintiff to the psychiatric ward on the seventh floor of of

03   the facility.   (Dkt. No. 10 at 8.)

04         As plaintiff describes the incident, he was returning from court, wearing a leg restraint

05   which had been specifically applied for trial, when the restraint locked up at the knee making it

06   difficult for plaintiff to walk.   (*Id*. at 9.)   Plaintiff contends that the transporting officers

07   pushed him faster than he could walk and pushed his head down so that he was unable to stand

08   up straight while he walked.   (*Id*.)   Plaintiff asserts that the officers' actions caused pain to his

09   lower back and to his right thigh.   (*Id*.)

10         According to plaintiff, once they arrived at the seventh floor psychiatric unit, where all

11   inmates are required to remove their socks and underwear, he told the transporting officers that

12   he could remove his underwear by himself, but the officers told him they thought he needed

13   help and then slammed him face down on the ground, put their knees on his neck and back, and

14   held his feet while they removed his clothes.   (*Id*. at 9-10.)   Plaintiff contends that during this

15   process, officers also made threats of violence and made comments of a sexual nature.   (*Id*.)

16         Defendants argue in their motion for summary judgment that defendant Weaver did not

17   use excessive force against plaintiff at any time.   Defendants have submitted in support of their

18   motion for summary judgment the declaration of defendant Weaver and a copy of the report he

19   prepared regarding the incident in question on the day the incident occurred.   (Dkt. No. 32.)

20         According to defendant Weaver, he had two interactions with plaintiff on the day the

21   incident in question occurred.   (Dkt. No. 32 at 2.)   At approximately 11:20 a.m., plaintiff was

22   discovered reaching his arms out of a holding cell after having taken apart a rolling chair that

REPORT AND RECOMMENDATION
PAGE -11

01  his attorney had previously been sitting in.  (Dkt. No. 32, Ex. 1.)  Plaintiff had dismantled the

02  top of the chair from its base and had pushed both pieces away from the cell, but claimed

03  ignorance when he was asked for the missing parts.  (*Id.*)  Plaintiff was handcuffed by

04  defendant Weaver and a pat search was conducted.  (*Id.*)  Plaintiff was verbally abusive to

05  officers during this process.  (*Id.*)  Officers subsequently discovered the missing metal chair

06  parts had been thrown behind the holding cell.  (*Id.*)

07       Less than an hour later, defendant Weaver was assigned to escort plaintiff back to the

08  jail.  (*Id.* at 2 and Ex. 1.)  During the escort, plaintiff directed racial insults at defendant

09  Weaver and the other escorting officer.  (*Id.*)  Plaintiff informed officers that he would kill

10  them if they took him to the psychiatric floor and that he would cut their throats.  (Dkt. No. 32

11  at 2 and Ex. 1.)  Plaintiff also claimed that he would kill defendant Weaver's entire family.

12  (*Id.*)

13       While in the elevator from the intake area of KCCF to the seventh floor, plaintiff

14  became resistive.  (*Id.*)  Defendant Weaver responded to this resistance by raising plaintiff's

15  arms above his shoulders to counter plaintiff's attempts to gain leverage.  (*Id.*)  The escort

16  then continued to the 7 North Unit with an additional three officers present.  (*Id.*)  Defendant

17  Weaver states that plaintiff did not offer any further resistance and that plaintiff was taken out

18  of his restraints after being placed in his cell.  (Dkt. No. 32 at 2.)  Defendant Weaver further

19  states that his only physical contact with plaintiff was when he handcuffed plaintiff after

20  plaintiff had dismantled the chair while in the holding cell, and when he raised plaintiff's arms

21  above his head after plaintiff became resistive in the elevator during the escort to the seventh

22  floor.  (*Id.*)

REPORT AND RECOMMENDATION
PAGE -12

01      Plaintiff, in his response to defendants' motion, asserts that defendant Weaver's

02  assertion that he had no physical contact with plaintiff except for handcuffing him and raising

03  his hands above his head constitutes perjury.  (Dkt. No. 33 at 4-5.)  Plaintiff contends that

04  defendant Weaver slammed his head against the wall during the morning pat search and that

05  defendant Weaver later subjected him to a forced strip search.  (*Id*.)  Once again, however,

06  plaintiff offers no evidence to support his version of events.   There is no evidence in the record

07  that plaintiff suffered any injury as a result of the actions of defendant Weaver or any of the

08  escorting officers.   The record is also devoid of any evidence establishing that defendant

09  Weaver was, in fact, the officer involved in the alleged forceful removal of plaintiff's clothes

10  once he arrived on the seventh floor.   Accordingly, defendants are entitled to summary

11  judgment with respect to the excessive force claim asserted against defendant.

12      Plaintiff also complains that defendant Weaver issued verbal threats and made sexual

13  comments to him during the February 12, 2008 escort.  (*See* Dkt. No. 10 at 8-10.)   However,

14  the Ninth Circuit has held that verbal harassment or abuse is not sufficient to state a claim under

15  § 1983.  *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997) (citing *Oltarzewski v. Ruggiero*,

16  830 F.2d 136, 139 (9th Cir. 1987).   Thus, to the extent plaintiff claims that his constitutional

17  rights were violated by defendant Weavers' alleged verbal harassment or abuse, those claims

18  must be dismissed.

19                                              Medical Care

20      Plaintiff asserts in his amended complaint that he was denied necessary medications to

21  treat his mental health issues.  This claim arises out of a January 2010 medical grievance he

22  filed concerning the Jail's failure to give him medications that had previously been prescribed

REPORT AND RECOMMENDATION
PAGE -13

01   for him at Western State Hospital. (Dkt. No. 10 at 4.) Plaintiff contends that defendant

02   Dumas responded to this grievance "with indifference" when he told plaintiff that he would

03   only get a single medication. (*Id.*) Plaintiff further contends that the failure to provide him

04   with the necessary medications caused him to go through withdrawal, to stay awake for five

05   days straight, and to hallucinate. (*Id.*)

06       Because plaintiff was apparently a pretrial detainee at the time his claims arose, any

07   claim of inadequate medical care arises under the Due Process Clause of the Fourteenth

08   Amendment and not under the Eighth Amendment prohibition against cruel and unusual

09   punishment. *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996). However, the Ninth Circuit

10   has made clear that, with respect to medical needs, "the due process clause imposes, at a

11   minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the

12   established right to not have officials remain deliberately indifferent to their serious medical

13   needs.'" *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citing *Carnell*, 74

14   F.3d at 979.)

15       A medical need is deemed serious if the failure to treat the condition could result in

16   further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin v.*

17   *Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

18   In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to

19   act on the part of prison officials. *Id*. at 1060.

20       Defendants argue in their motion for summary judgment that plaintiff's claim of

21   inadequate medical care against defendant Dumas is without merit as there is no evidence that

22   defendant Dumas was deliberately indifferent to plaintiff's serious medical needs. Defendants

REPORT AND RECOMMENDATION
PAGE -14

01   are correct.

02   The record reflects that on January 5, 2010, plaintiff submitted a medical grievance to

03   KCCF Jail Health Services asking that he be given Vistaril and Trazodone which had been

04   prescribed for him at Western State Hospital.  (*See* Dkt. No. 10 at 18.)  Defendant Dumas

05   responded to that grievance, advising that the only medication which had been renewed from

06   plaintiff's stay at Western State was Buspar.[3]  (Dkt. No. 10 at 18.)   When plaintiff appealed

07   this response, asserting that doctors at Western State told him he would get additional

08   medications in jail, he was advised by someone other than defendant Dumas that he would need

09   to fill out a release of information form for Western State Hospital in order for KCCF Jail

10   Health Services to review those records.  (*Id*.)   There is no indication in the record that

11   plaintiff pursued this issue further with KCCF staff.

12   Plaintiff asserts in his response to defendants' motion that defendant Dumas did not take

13   plaintiff's requests for medications seriously and that he suffered mentally as a result.  (Dkt.

14   No. 33.)   Plaintiff, however, offers no evidence to support his assertions.   While plaintiff was

15   clearly dissatisfied with the medications he was provided by the medical staff at KCCF, the

16   controversy here appears to amount to nothing more than a difference of opinion as to what

17   treatment was appropriate for plaintiff's mental health issues.   It is well established that

18   differing opinions on medical treatment do not amount to a violation under the Eighth

19   Amendment.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Sanchez v. Vild*,

20   891 F.2d 240, 242 (9th Cir. 1989)).

21   _____

22   3 There is no indication on the grievance, or anywhere else in the record before this Court, who was responsible for making decisions regarding the medications plaintiff was to receive while at KCCF.

REPORT AND RECOMMENDATION
PAGE -15

01        Plaintiff offers no evidence that the course of treatment chosen by KCCF medical staff

02   was medically unacceptable or that decisions regarding his treatment were made in conscious

03   disregard of an excessive risk to plaintiff's health.  Plaintiff therefore fails to establish a

04   violation of his Eighth Amendment rights.  *See Jackson*, 90 F.3d at 332.   Accordingly,

05   defendants are entitled to summary judgment with respect to plaintiff's claim that defendants

06   failed to provide him necessary medical care.

07                                        Classification

08        Plaintiff asserts in his amended complaint that he was confined in isolation units for

09   long periods of time and was denied opportunities to return to general population.  (*See* Dkt.

10   No. 10 at 4.)  Plaintiff contends that his lengthy periods of isolation were harmful to his mental

11   health.  (*Id*.)  Plaintiff attributes his lengthy stays in isolation to defendants Vicki Shumaker,

12   Bernie Dennehy, Jesse Rollolazo, and Nancy Light who he claims either caused him to be

13   placed in isolation or denied his grievances seeking release from isolation.  (*See id*.)

14        When a pre-trial detainee challenges some aspect of his pretrial detention that is not

15   alleged to violate any express guarantee of the Constitution, the issue to be decided is the

16   detainee's right to be free from punishment.  *Bell v. Wolfish*, 441 U.S. 520, 533 (1979).  Such

17   challenges arise under the Fourteenth Amendment Due Process Clause.  *Id*. at 535.  While the

18   Due Process Clause protects pretrial detainees from punishment, not every disability imposed

19   during pretrial detention constitutes "punishment" in the constitutional sense.  *Id*. at 537.

20        The test for identifying unconstitutional punishment at the pretrial stage of a criminal

21   proceeding requires a court to examine "whether there was an express intent to punish, or

22   'whether an alternative purpose to which [the restriction] may rationally be connected is

REPORT AND RECOMMENDATION
PAGE -16

01 assignable for it, and whether it appears excessive in relation to the alternative purpose assigned

02 [to it].'" *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 538).

03 "For a particular governmental action to constitute punishment, (1) that action must cause the

04 detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action

05 must be to punish the detainee."   *Demery*, 378 F.3d at 1029.   Further, "to constitute

06 punishment, the harm or disability caused by the government's action must either significantly

07 exceed, or be independent of, the inherent discomforts of confinement."   *Id*. at 1030.

08        The Supreme Court has recognized that "maintaining institutional security and

09 preserving internal order and discipline are essential goals that may require limitation or

10 retraction of the retained constitutional rights of both convicted prisoners and pretrial

11 detainees." *Bell v. Wolfish*, 441 U.S. at 546.   The Supreme Court has further recognized that

12 prison administrators "should be accorded wide-ranging deference in the adoption and

13 execution of policies and practices that in their judgment are needed to preserve internal order

14 and discipline and to maintain institutional security."   *Id*. at 547.   Plaintiff's claims regarding

15 his retention in the isolated housing units are properly analyzed under the standard announced

16 in *Bell*.

17        Plaintiff asserts that he spent over two years confined in a solitary cell while in the

18 KCDAJD.   (*See* Dkt. No. 10 at 11.)   However, all of the alleged improper classification

19 actions referenced in the amended complaint occurred in 2010 during plaintiff's second period

20 of confinement in KCCF.   (*See* Dkt. No. 10 at 11.)   According to defendant Dennehy, who

21 submitted a declaration in support of defendants' summary judgment motion, when an inmate is

22 booked into the KCDAJD, he begins with the same housing classification he had when he was

REPORT AND RECOMMENDATION
PAGE -17

01  last released.  (Dkt. No. 30 at 2.)   Thus, plaintiff, who spent a majority of his prior

02  incarceration in the KCDAJD classified as an ultra security inmate and housed in

03  administrative segregation, received the same classification and housing assignment when he

04  was booked back into KCCF in July 2009, less than two months after his previous release.

05  (Dkt. No. 30 at 2.)

06       On February 4, 2010, plaintiff filed a grievance in which he complained about the

07  amount of time he had spent in isolation and about the deficiencies in the treatment he was

08  receiving for his mental health issues.  (Dkt. No. 10 at 13.)   Defendant Shumaker responded

09  to plaintiff's grievance, advising him that he would need to address his concerns regarding

10  mental health treatment to the jail medical staff and that his administrative segregation

11  placement was the result of his failure to follow jail rules and behavior expectations while

12  housed in the general population.  (*Id*.)   Plaintiff appealed this response and defendant

13  Dennehy denied the appeal, advising plaintiff that his classification status would not change

14  because of his history of uncooperative behavior and assaults on staff which made him a risk to

15  the safety and security of the institution.  (*Id*.)

16       On April 14, 2010, defendant Rollolazo determined that plaintiff needed to be placed in

17  protective custody because of media coverage which identified him as having allegedly

18  engaged in satanic and anti-Semitic acts which involved defacing area churches.  (*See* Dkt. No.

19  30, Ex. 2.)   On April 26, 2010, defendant Light responded to a kite from plaintiff requesting

20  that he be allowed to return to general population.  (*See* Dkt. No. 30, Ex. 2.)   At that time,

21  defendant Light apparently indicated to plaintiff that because of extensive notes in his record

22  regarding his difficulties in general population, a review for early release from administrative

REPORT AND RECOMMENDATION
PAGE -18

01   segregation was not warranted.   (*Id*.)

02       On May 8, 2010, plaintiff filed a grievance in which he complained that defendant

03   Rollolazo had placed him in protective custody against his will and that he needed to be given

04   stronger medication to address his mental health issues.   (Dkt. No. 10 at 16.)   Plaintiff also

05   indicated in his grievance that he had complained to defendant Light, though the grievance does

06   not make clear the precise nature of those complaints.   (*See id*.)

07       Defendant Shumaker responded to plaintiff's grievance advising, once again, that

08   plaintiff would need to address his concerns regarding his medical issues to the jail health staff

09   via kite or through the medical grievance process.   (*Id*. at 17.)   She further advised plaintiff

10   that his classification issue was moot because he was no longer in protective custody.   (*Id*.)

11   Plaintiff appealed this response as it pertained to the issue of protective custody.   (*Id*.)

12   Defendant Dennehy denied the appeal, advising plaintiff that he had been placed in protective

13   custody for his own protection because he then had seven "keep separates" which put him at

14   risk.   (*Id*.)   Defendant Dennehy further advised plaintiff that he would remain in isolation

15   because of inappropriate behavior towards staff and comments made to other inmates.   (*Id*.)

16       Defendants argue in their motion for summary judgment that they did not violate

17   plaintiff's constitutional rights by keeping him housed in administrative segregation or, for a

18   short time, in protective custody because plaintiff's own behavior warranted the placements.

19   Plaintiff, in his response to defendants' motion, suggests that his placements in protective

20   custody and administrative segregation were unnecessary and unwarranted and that they only

21   made his mental health worse.   (Dkt. No. 33 at 6-7.)   Plaintiff, however, offers no evidence

22   that the placements were intended as punishment and, in fact, the evidence in the record

REPORT AND RECOMMENDATION
PAGE -19

01 suggests the contrary.   The evidence demonstrates that plaintiff was placed in administrative

02 segregation in response to behavioral issues and that he was placed in protective custody for his

03 own protection.   Accordingly, defendants are entitled to summary judgment with respect to

04 plaintiff's classification claims.

05                                                    CONCLUSION

06          For the reasons set forth above, this Court recommends that defendants' motion for

07 summary judgment be granted and that plaintiff's amended complaint, and this action, be

08 dismissed with prejudice.   A proposed Order accompanies this Report and Recommendation.

09          DATED this 4th day of April, 2011.

10

11                                                    _____
                                                       Mary Alice Theiler
12                                                     United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -20